UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X
JAMES HODGE,

                        Plaintiff,

        - against -               **03-CV-6279 (TCP)**

CITY OF LONG BEACH, LONG BEACH      **MEMORANDUM**
POLICE DEPARTMENT, POLICE             **AND ORDER**
OFFICER FILES, in his individual and
official capacity, POLICE OFFICER
WILLIAMS, in his individual and official
capacity, POLICE OFFICERS JOHN DOE
1-10, in their official and individual
capacities, (those being the names of officers
who were present and committed wrongful
acts and whose names are known by the
other Defendants),

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X
PLATT, District Judge.

       Before the Court is defendants' motion for summary judgment pursuant to

Federal Rule of Civil Procedure 56. For the following reasons, defendants'

motion is hereby **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

**A.**       **Facts**

       **1.**       **Hiring and Training of the Individual Defendants**

       Officer Fales and Officer Williams ("individual defendants") received

training at the Nassau County Police Academy ("NCPA") for approximately six

months from February 4, 2002 until they graduated on August 20, 2002. Def.

56.1 Stmt. ¶ 1. Before joining the Long Beach Police Department ("LBPD"),

Defendant Fales' law enforcement experience included his employment as a Uniformed Court Officer for New York State for twelve years. Def. 56.1 Stmt. ¶ 2; Plt. 56.1 Stmt. ¶ 9.[1] Defendant Williams was a member of the Armed Forces and was honorably discharged and had no law enforcement experience prior to joining the LBPD. Def. 56.1 Stmt. ¶ 3; Plt. 56.1 Stmt. ¶ 10.

Training at the NCPA consisted of, among other things, legal courses, defense tactics, vehicle operation instruction and standard police academy criteria. Def. 56.1 Stmt. ¶ 4. Individual defendants participated in field training for approximately six to eight weeks while attending the NCPA and continued training for a period of approximately two weeks after graduation. Def. 56.1 Stmt. ¶ 5. During field training sessions, individual defendants accompanied senior LBPD officers on routine patrol. Def. 56.1 Stmt. ¶ 6.

While at the NCPA, individual defendants received specific instructions regarding domestic dispute incidents, including courses and role playing sessions in which they participated in simulated domestic dispute incidents. Def. 56.1 Stmt. ¶ 7. During training, individual defendants were instructed that incidents of domestic disputes were serious and very dangerous matters, that the responding police officer must maintain control of the situation in addition to identifying the aggressor who might also be the person who contacted the police. Def. 56.1 Stmt.

---

1. Plaintiff filed a Local Rule 56.1(b) statement opposing defendants' motion for summary judgment which also contains additional numbered paragraphs. Plaintiff's opposition to defendants' 56.1 statement is denoted as "Plt. 56.1 Ctr. Stmt."; the additional paragraphs are denoted "Plt. 56.1 Stmt." Plaintiff's 56.1(b) statements which are substantively inaccurate or not supported by the given citation are excluded unless supported by other evidence.

¶ 8.  Individual defendants were aware of an LBPD Departmental Order which set out specific guidelines for responding to domestic disputes.  Def. 56.1 Stmt. ¶ 9.

Defendant Fales described training in this area as a "small snippet of training during the actual academy."  Plt. 56.1 Stmt. ¶¶ 3-4; Dec. Brewington, Exh. G, Tr. Fales 101:12-13.  Defendant Williams could not recall whether LBPD provided new officers with additional field training in this area.  Dec. Brewington, Exh. I, Tr. Williams 11:22-25.  Upon completion of the basic course for police officers, individual defendants received their Certification of Training.  Def. 56.1 Stmt. ¶ 10.

### 2.	The 911 Emergency Call by Bertha Hodge

On the morning of December 13, 2002, plaintiff's mother Bertha Hodge ("Ms. Hodge") overheard a disturbance between her son Philip Hodge ("Philip") and his wife, Catherine.  Def. 56.1 Stmt. ¶ 11; Plt. 56.1 Ctr. Stmt. ¶ 11.  An argument had occurred and Philip was banging on the walls of Ms. Hodge's home.  Def. 56.1 Stmt. ¶ 12.  Mrs. Hodge believed Philip was intoxicated and although she attempted to calm him down, he loudly continued banging on the walls.  Def. 56.1 Stmt. ¶ 13.

On that morning, James Hodge ("plaintiff" or "James") returned home to find his brother, Philip, and his mother, Ms. Hodge, upset over a family situation.  Plt. 56.1 Stmt. ¶ 13.  Plaintiff heard Philip yelling and went into his bedroom.  Def. 56.1 Stmt. ¶ 14.  Ms. Hodge testified that plaintiff and Philip left the bedroom and plaintiff was "holding him [Philip] in the back," and "trying to

constrain" him.  Def. 56.1 Stmt. ¶ 15.  Plaintiff and Philip then left the Hodge residence from the Fulton Street side and stood outside on the sidewalk corner near Riverside Boulevard.  Def. 56.1 Stmt. ¶ 16; Plt. 56.1 Stmt. ¶ 16.  Shortly thereafter, their older brother, Alonzo Hodge ("Alonzo"), arrived at the Hodge residence whereupon plaintiff advised Alonzo as to the situation while the three brothers remained on the corner of Riverside Boulevard and Fulton Street.  Plt. 56.1 Stmt. ¶¶ 17-18.  Alonzo pulled Philip aside to verify the details of what he had heard from plaintiff.  Plt. 56.1 Stmt. ¶ 19.

At some point after the brothers went outside, Ms. Hodge called 911 to request police assistance as transcribed below:

| | |
|---|---|
| DISPATCHER: | Long Beach Police (inaudible). |
| FEMALE CALLER: | Can I have the police come to 95 East Fulton? |
| DISPATCHER: | 95 East Fulton? |
| FEMALE CALLER: | Yes. |
| DISPATCHER: | What is the problem there? |
| FEMALE CALLER: | We have a problem here. |
| DISPATCHER: | What type of problem? |
| FEMALE CALLER: | Something is wrong with my son. |
| DISPATCHER: | Your son?  How old is he? |
| FEMALE CALLER: | 20 something. |
| DISPATCHER: | Are you having an argument? |

FEMALE CALLER:  Come talk to him, yes.

DISPATCHER:  Okay, it's a one family?  You are a one-family house?

FEMALE CALLER:  Yes, 95 East Fulton.

Def. 56.1 Stmt. ¶ 17; Dec. Ciulla, Exh. G.  The police department received the call for assistance at 9:29 a.m.  Dec. Ciulla, Exh. L.

### 3.    Individual Defendants are Dispatched to the Hodge Residence

After receiving a telephone call regarding the domestic situation, LBPD's dispatcher radioed individual defendants to respond to a family disturbance in progress at the Hodge residence.  Def. 56.1 Stmt. ¶ 18.  Plaintiff notes that when individual defendants were dispatched to the Hodge residence to address the mother/son dispute, they were four months into their employment with LBPD and had limited experience with domestic disturbances.  Plt. 56.1 Stmt. ¶ 12.

With lights and siren on in their marked patrol car, individual defendants arrived and parked in front of the residence.  Def. 56.1 Stmt. ¶ 19.  Individual defendants testified that neither of them knew, or knew of, plaintiff before they were dispatched to the Hodge Residence that day.  Def. 56.1 Stmt. ¶ 23.

Defendant Fales testified that when he and Officer Williams arrived at the Hodge residence, he went to the front door and spoke to Ms. Hodge.  Def. 56.1 Stmt. ¶ 20; Dec. Ciulla, Exh. C, Tr. Fales 27:6-25.  Defendant Williams testified that as he and Fales both left the car, he observed three males on Riverside Boulevard, approximately thirty (30) feet away.  As Williams approached the

-5-

men, he observed two (2) of the men standing chest-to-chest while involved in a very heated discussion.  Def. 56.1 Stmt. ¶ 21.

Ms. Hodge testified, however, that her three sons were talking on the Riverside Boulevard side of the house while both officers came to the house to speak to her.  Dec. Brewington, Exh. F, Tr. B. Hodge 50:18-25.  Conversely, plaintiff's other brother Alonzo testified that as he was talking with both of his brothers, he heard the sirens and saw the officers pull up.  Dec. Brewington, Exh. E, Tr. A. Hodge 58:12-13.[2]  Alonzo claimed he approached both officers and explained that he was attempting to resolve a family dispute.  Plt. 56.1 Stmt. ¶ 21.  Alonzo also testified that "one of the officers wanted to try and contact and speak with . . . [his] mother" who was either in the house or on the porch that faces Riverside Boulevard; he recalled that one officer left the immediate area to speak with her.  Dec. Brewington, Exh. E, Tr. A. Hodge 58:16-19; 60:21-61:9.  Plaintiff and his brother Philip testified that the brothers were engaged in a calm normal discussion when defendant officers arrived on the scene.  Plt. 56.1 Stmt. ¶ 20.

Based on his observation of the men's posture as he and defendant Fales arrived at the Hodge residence, defendant Williams called the LBPD, upon arrival, and through his portable unit, requested assistance.  Def. 56.1 Stmt. ¶ 21.  Meanwhile, Fales went to the home's front door and spoke with an individual

---

2.  Similarly, plaintiff testified that after the officers approached the threesome "one of the officers went to talk to my mother, and I think the other officer followed behind him a little bit, and then I guess talked to my mother about whatever the situation was."  Dec. Brewington, Exh. B, Tr. J. Hodge 48:10-14.  He also testified that it was Officer Fales who spoke to Bertha Hodge and that "Officer Williams more so stayed next to where we were.  I don't think he went all the way on the porch.  I don't recall."  *Id.* at 48:17-24.

now known to him as Bertha Hodge.[3]  Dec. Ciulla, Exh. C, Tr. Fales  27:22-25.

When Fales asked Ms. Hodge whether there was a problem, she pointed to the

street corner where the three men were standing and told Fales to speak to her son.

Def. 56.1 Stmt. ¶ 24; Dec. Cuilla, Exh. C, Tr. Fales 28:10-20.  During their brief

discussion, Fales observed broken glass on the front porch.  Def. 56.1 Stmt. ¶ 25.

Defendant Williams, still with the three men on Riverside Boulevard,

attempted to diffuse the heated discussion and asked, "Why am  I here?  What are

you up to?"  Def. 56.1 Stmt. ¶ 26.  As he approached the men, he observed that

one of them (later identified as plaintiff) had a tear in his white undershirt with

blood spatters around his chest area; plaintiff was also identified as one of the men

who had been standing chest-to-chest with another man, later identified as

plaintiff's brother Philip.  Def. 56.1 Stmt. ¶ 27.  Plaintiff testified, however, that

he, Alonzo and Philip Hodge were having a calm discussion outside of their

residence and that Alonzo advised the officers that it was a family situation.  Dec.

Brewington, Exh. B, Tr. J. Hodge 45:13-17; 47:23-48:2.  Alonzo Hodge testified

that while Fales was talking to Ms. Hodge, he believed he recalled "that this

officer who was near James continued to speak with him and [was] saying that he

knows who he is and said that he was a troublemaker and that he has–had some

problem with the city or a suit."  Dec. Brewington, Exh. E, Tr. A. Hodge 71:5-9.

Alonzo could not recall plaintiff's response to Williams' alleged statement.  *Id.* at

3.  Ms. Hodge contends that upon their arrival, both individual defendants spoke with her at the Fulton Street entrance.

71:10-12.

Williams testified that despite his efforts to diffuse the situation and engage the three men in a conversation to find out what happened, none of them responded to or looked at him. Def. 56.1 Stmt. ¶ 28. Defendant Fales, unable to obtain any information from Ms. Hodge and having ascertained that she was not in any danger, came down the steps on the Fulton Street side of the home toward defendant Williams who was standing on the corner with the three men. Def. 56.1 Stmt. ¶ 29; Dec. Ciulla, Exh. C, Tr. Fales 31:9-19; Plt. 56.1 Stmt. ¶ 26. Ms. Hodge testified that as she went to the door to speak with one officer (defendant Fales), she recalled the other officer talking to plaintiff and that plaintiff began to walk away down the street. Dec. Brewington, Exh. F, Tr. B. Hodge 55:12-15. She also stated that she saw the officer grab plaintiff "in the back" whereupon Fales said, "Let me go help my partner." Ms. Hodge advised Fales that the grabbed man was her son James and not Philip, about whom she had originally called police. *Id.* at 55:23-56:21.

When Fales arrived on the corner, he observed that plaintiff's shirt was torn and had blood spatters. Def. 56.1 Stmt. ¶ 30. Plaintiff contends that defendant Fales had insufficient information to objectively conclude that plaintiff's shirt was blood stained in that he had not asked defendant Williams if he had obtained any information from plaintiff. Plt. 56.1 Ctr. Stmt. ¶ 30; Plt. 56.1 Stmt. ¶ 29. Fales also noticed that plaintiff's hands were in his pockets and, for safety reasons, requested that plaintiff take them out. Def. 56.1 Stmt. ¶ 31.

-8-

Despite Fales' repeated requests, plaintiff refused to remove his hands from his pockets, became agitated and yelled at the officers stating, among other things, "I don't have to do it. Get a supervisor. You don't know who I am." Def. 56.1 Stmt. ¶¶ 32-33.

Philip testified that he could not recall hearing plaintiff tell the officers that they had no problem with him, but thought that defendant Fales' alleged statement to plaintiff, to wit: "I know you're James Hodge, and I'm gonna talk to you," sounded "familiar." Dec. Brewington, Exh. D, Tr. P. Hodge 97:7-15.

Defendant Fales testified that plaintiff turned around and began walking north on Riverside away from the officers and his brothers, at which time Fales ordered him to stop. Def. 56.1 Stmt. ¶ 34. Alonzo testified that Philip was visibly concerned that the officers were questioning plaintiff and, witnessing this, plaintiff took five to six steps in his brothers' direction. Plt. 56.1 Ctr. Stmt. ¶ 32. When asked whether plaintiff responded to the officers, Alonzo testified that before plaintiff could respond, defendant Fales "kind of shoved him." Dec. Brewington, Exh. E, Tr. A. Hodge 78:24-79:3.

Plaintiff continued walking away in an agitated state while Fales continued to order plaintiff to stop or face arrest. Def. 56.1 Stmt. ¶ 35. With Fales following in close proximity, plaintiff abruptly stopped and turned around while waving his arms. Def. 56.1 Stmt. ¶¶ 36-37. Face-to-face with plaintiff and fearing for his safety, Fales grabbed plaintiff by one or both arms to gain control of him and plaintiff, in turn, grabbed Fales' shirt. Def. 56.1 Stmt. ¶¶ 38-39.

Plaintiff contends that he was hit in the back and spun around at which time Officer Williams grabbed plaintiff in a bear hug while Officer Fales grabbed plaintiff about his neck in an attempt to arrest him. Plt. 56.1 Ctr. Stmt. ¶¶ 34-36.

Defendant Williams testified that as he attempted to obtain information from Alonzo or Philip Hodge, he observed Officer Fales fall back on the heels of his feet as though he had been thrust backward. Dec. Ciulla, Exh. D, Tr. Williams 38:8-18. Williams immediately ran to assist Fales by removing plaintiff's right arm from clutching Fales' shirt. Def. 56.1 Stmt. ¶ 40; Dec. Ciulla, Exh. D, Tr. Williams 40:9-12. Defendant Williams testified that he and defendant Fales held plaintiff's arm for ten seconds. Def. 56.1 Stmt. ¶ 41.

As defendants held plaintiff, several other police officers arrived at the scene, including Officers James Larson and Christopher Ryan who arrived at 9:35 a.m., *i.e.*, approximately two minutes after individual defendants arrived at plaintiff's home in response to his mother's 911 call. Also present was Police Officer Dean Burke, who also arrived at 9:37 a.m. Def. 56.1 Stmt. ¶¶ 42-43; Dec. Ciulla, Exh. L. Defendants released their hold on plaintiff when the newly arrived officers indicated that they knew him. Def. 56.1 Stmt. ¶ 44. Plaintiff testified that he could not recall whether two, five or ten minutes had passed from the time he was allegedly struck by Officer Fales until additional officers arrived at the scene but thought that "it happened quickly." Dec. Brewington, Exh. B, Tr. J. Hodge 77:18-78:5. Plaintiff also testified that when Officer Burke arrived, he "told the guys to either loosen up or . . . let him go." *Id.* at 79:21-24.

Ms. Hodge testified that although she could not say exactly how long the officers held plaintiff, she estimated that it was longer than fifteen minutes. Dec. Brewington, Exh. F, Tr. B. Hodge 74:22-75:8. In later testimony, Ms. Hodge stated that she could not say for sure, but estimated that plaintiff may have been held by the officers for thirty minutes. *Id.* at 96:21-97:8.

Ms. Hodge was also unsure whether plaintiff was actually handcuffed. Alonzo testified that he believed plaintiff was handcuffed but could not recall with certainty. Plaintiff was unsure whether he was ever actually handcuffed or not. Defendants testified that plaintiff was not handcuffed despite his resistance during the brief detention. Def. 56.1 Stmt. ¶ 45; Plt. 56.1 Ctr. Stmt. ¶ 40.

Once the officers released plaintiff, he continued to be agitated and ranted and raved about calling "Johnnie Cochran and Fred Brewington." Def. 56.1 Stmt. ¶ 48. Plaintiff contends that when defendant Fales grabbed him by the neck, he called out to his mother to communicate with his attorneys; Ms. Hodge spoke to someone from plaintiff's attorney's office. Plt. 56.1 Ctr. Stmt. ¶ 48. Additional LBPD officers arrived at the Hodge residence, including Lieutenant Vincent Buscemi ("Buscemi") who prepared a report of the incident. Def. 56.1 Stmt. ¶ 46. Buscemi, one of the last officers to reach the residence, arrived at approximately 9:39 a.m. Def. 56.1 Stmt. ¶ 47; Dec. Ciulla, Exh. L. Buscemi spoke to plaintiff and his mother, Ms. Hodge, in their residence. Plt. 56.1 Ctr. Stmt. ¶ 45. At that point, Ms. Hodge was on the phone with plaintiff's attorney who advised that the officers should leave the premises if plaintiff was not under arrest. Plt.

56.1 Ctr. Stmt. ¶ 46.

The Domestic Incident Report prepared that morning indicates that Ms.
Hodge refused to give a statement of allegations or to cooperate with the police.
Def. 56.1 Stmt. ¶ 49; Dec. Ciulla, Exh. M. Six days after the incident, on
December 19, 2002, Buscemi submitted an incident report to Police Commissioner
John J. Laffey which indicates that Fales and Buscemi conferred at the scene and
agreed that there was no cause to arrest plaintiff. Def. 56.1 Stmt. ¶ 50; Dec. Ciulla,
Exh. N.

Plaintiff allegedly suffered minor bruises and abrasions. Def. 56.1 Stmt. ¶
51. Philip testified that after the police left that morning, he recalled plaintiff
saying he had been choked. Dec. Brewington, Exh. D, Tr. P. Hodge 93:13-14.
Plaintiff contends that he suffered injuries in addition to bruises on his neck and
back, such as difficulty swallowing and talking, depression, paranoia, and difficulty
sleeping. Plt. 56.1 Ctr. Stmt. ¶ 51.

### 4. Plaintiff's Complaint Against the Individual Defendants to the Nassau County District Attorney's Office

On or about January 22, 2003, plaintiff filed a criminal complaint, dated
December 13, 2002, with the Nassau County District Attorney alleging that the
individual defendants assaulted him while responding to Ms. Hodge's emergency
911 call. Def. 56.1 Stmt. ¶ 52; Plt. 56.1 Ctr. Stmt. 52. After an extensive
investigation by the Special Investigations Bureau, including interviews with
plaintiff, his brothers Alonzo and Philip Hodge and Ms. Hodge, the Bureau

determined that individual defendants had acted appropriately.[4]  Def. 56.1 Stmt. ¶ 53.  Plaintiff contends that neither he nor any of his witnesses were interviewed, no extensive investigations were conducted and no findings were released.[5]  Plt. 56.1 Ctr. Stmt. ¶ 53.

**B.     Plaintiff's Amended Complaint**

Plaintiff's amended complaint dated April 7, 2004 alleges false arrest, use of unlawful force and municipal liability pursuant to 42 U.S.C. § 1983; conspiracy pursuant to 42 U.S.C. § 1985 to bring about plaintiff's seizure, arrest and detention, all without lawful or proper basis or justification on account of plaintiff's race and color;[6] and violation of 42 U.S.C. § 1986 based on plaintiff's claim that defendants knew or should have known that the beating, excessive use of force, detainment, false arrest and wrongful imprisonment violated plaintiff's rights.

## II.  DISCUSSION

For the reasons that follow, defendants' motion for summary judgment is granted as to plaintiff's false arrest, municipal liability and 42 U.S.C. § 1986 claims and denied as to plaintiff's excessive force claim.  That portion of

---

4.  The final agency determination dated December 23, 2003 found that plaintiff's complaint did "not merit the initiation of criminal prosecution and further action by the Special Investigations Bureau" was unwarranted.  Dec. Ciulla, Exh. Q.

5.  Plaintiff also disputes the validity of the report on the basis that it was "dated 10 days after the incident occurred."  Plt. 56.1 Ctr. Stmt. ¶ 53.  In fact, the report is dated one year and ten days after the incident, *i.e.*, December 23, 2003.

6.  Plaintiff voluntarily withdrew his 42 U.S.C. § 1985(3) conspiracy claim.  Accordingly, that claim is hereby dismissed with prejudice.

defendants' motion seeking qualified immunity is also hereby denied.

## A.     Legal Standard for Summary Judgment

A motion for summary judgment may not be granted unless the court determines that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting Federal Rule of Civil Procedure 56(c)).

"Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Williams v. R.H. Donnelly Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). The court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Id.*; *Castle Rock Entertainment, Inc. v. Carol Publishing Group*, 150 F.3d 132, 137 (2d Cir. 1998). *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.") (citing Rule 56(c)).

"A party opposing a properly brought motion for summary judgment bears the burden of going beyond the [specific] pleadings, and 'designating specific facts showing that there is a genuine issue for trial.' " *Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If there is any evidence in the record from which a reasonable inference may be drawn in favor of the non-moving party on a material

issue of fact, summary judgment is improper. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

"[T]he judge's role in reviewing a motion for summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*.

## B. Defendants' Motion for Summary Judgment

### 1. Plaintiff's 42 U.S.C. § 1983 Claims

#### a. False Arrest

A civil rights claim for false imprisonment requires a plaintiff to establish "that the defendant intended to confine the plaintiff, that the plaintiff was conscious of the confinement and did not consent to the confinement, and that the confinement was not otherwise privileged." *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 85 (2001). The elements of a false arrest claim pursuant to 42 U.S.C. § 1983, "resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause," are "substantially the same as under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest. . . whether that action is brought under state law or under § 1983." *Id*. (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994). *See Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d

Cir. 1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.").

An individual may also be stopped and briefly detained for investigative purposes based on a "reasonable suspicion" that criminal activity "may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). In light of the limited nature of the intrusion, "stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975). *See United States v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006) ("Reasonable suspicion requires considerably less of a showing than probable cause.") (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

There is, however, no bright line rule separating an arrest from a seizure based on reasonable suspicion. "Whether an arrest supported by probable cause occurs, as distinct from a form of Fourth Amendment intrusion supportable by less than probable cause, depends on the seizure's level of intrusiveness, and on the corresponding degree of justification required to effect each level of intrusiveness." *Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)) ("The scope of detention must be carefully tailored to its underlying justification."). Thus, probable cause means a "fair probability that contraband or evidence of a crime will be found," *Illinois v. Gates*, 462 U.S. 213, 238 (1983), while "the level of suspicion required for a *Terry* stop is obviously less demanding." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *United States* v. *Montoya de Hernandez*, 473 U.S. 531, 541, 544 (1985). Both arrests and

seizures based on less than probable cause which are "unreasonable" are actionable pursuant to 42 U.S.C. § 1983. *Posr*, 944 F.2d at 98 (citing *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989)).

Courts have used "a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person," including terms like "articulable reasons" and "founded suspicion." *United States v. Cortez*, 449 U.S. 411, 417 (1981). While these terms "fall short of providing clear guidance dispositive of the myriad factual situations that arise," the "essence of what has been written is that the totality of the circumstances" must be taken into account to determine whether a police officer's suspicions had a "particularized and objective basis" on which to briefly detain and investigate someone or something.[7] *Id. See Sokolow,* 490 U.S. at 3 (DEA agents had reasonable suspicion to detain defendant where he paid $2,100 for two airplane tickets from a roll of $20 bills; traveled under an assumed name from Hawaii to Miami, a source city for illicit drugs, where he remained for only forty-eight hours; appeared nervous during his trip; and checked no luggage); *United States v. Place*, 462 U.S. 696, 698-99, 706 (1983) (applying *Terry* and upholding DEA agents initial seizure of defendant's luggage in New York based on information from Florida based agents about Place's suspicious behavior at the airport, discrepancies between two street addresses on his luggage tags, information that neither address existed and that defendant's

---

7. *See Cortez*, 449 U.S. at 418 ("[T]he assessment must be based upon all the circumstances . . . and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.").

telephone number matched another address on the same street); *Sibron v. New York*, 392 U.S. 40, 62-63 (1968) (suppressing evidence obtained from search and finding no probable cause or reasonable suspicion where officer was not acquainted with defendant, had no information about his criminal activities and merely relied upon observing defendant talking to known narcotic addicts over an eight hour period); *McCargo*, 464 F.3d at 198 (reasonable suspicion that defendant involved in attempted residential break-in based on the time of night and his proximity to the house, which was located in a high-crime area).

Defendants argue that plaintiff's false arrest claim should be analyzed under the "reasonable suspicion" standard because plaintiff was briefly detained during a police investigation of a domestic dispute. Plaintiff contends that there is a question of fact as to whether plaintiff was falsely arrested or whether the seizure was merely a brief detention.

In this case, individual defendants were dispatched to the Hodge residence based on Ms. Hodge's call to 911 wherein she advised the operator that she needed the police because there was a problem with her son. In contrast to Alonzo Hodge's testimony that the brothers were engaged in a calm discussion when defendant officers arrived, Williams testified that he immediately radioed for assistance because two of the three men (plaintiff and Philip) were standing chest-to-chest in a heated discussion. Additional officers arrived on the scene approximately two minutes after individual defendants.

Officer Fales noted broken glass on the Hodge porch; Ms. Hodge testified that the glass had not been broken prior to the time the brothers went outside. Once he ascertained that Ms. Hodge was uninjured, Fales observed Williams talking to plaintiff at the corner. Ms. Hodge testified that she saw Williams grab plaintiff from behind at which time Fales advised Ms. Hodge that he was going to assist Williams. Ms. Hodge then informed Fales that she had called the police about Philip and not James. Defendants were trained, however, that during a domestic disturbance, identities of aggressors and victims are subject to change.

Once he arrived at the corner, Fales testified that he noticed plaintiff's torn and bloodied shirt and Williams testified likewise.[8] Plaintiff, on the other hand, testified that he had no recollection of what he wore that morning. Fales testified that he directed plaintiff to remove his hands from his pants pockets; plaintiff could not recall whether his hands were in or out of his pockets at that time. While testifying in a New York State case,[9] however, plaintiff admitted that his hands were in his pockets and that Fales directed him to take them out. Supp. Dec. Ciulla, Exh.

8. Plaintiff argues that neither he nor any eyewitnesses recall him wearing a tee shirt spattered with blood and that it was unlikely he would be so dressed given that it was December. Plt. Mem. in Opp. p. 6. Plaintiff's inability to recall, within reason, what he was wearing does not raise a triable issue of material fact. Rather, it leaves individual defendants' testimony that plaintiff was wearing a torn bloodied white tee shirt uncontroverted, particularly when combined with Fales' and Ms. Hodge's testimony about the newly broken mirror on the home's porch. *See* Dec. Brewington, Exh. F, Tr. B. Hodge 47:25-49:8; Dec. Brewington, Exh. G, Tr. Fales 29:9-12. In addition, plaintiff's opposition papers refer to eyewitnesses and what they might have seen or saw. As no eyewitness testimony or affidavits were submitted, references to eyewitnesses will not be taken into account.

9. Plaintiff testified in *New York v. Krakowski* in City Court of the City of Long Beach, New York before the Honorable Roy Tepper on or about June 24, 2003.

V.

Furthermore, defendants testified that plaintiff was not handcuffed. In addition, neither plaintiff nor his mother or brother could testify conclusively as to whether plaintiff was handcuffed or not. Nor was he patted down or searched. Rather, by plaintiff's own admission, he was released by the individual defendants when Officer Burke arrived at the scene at 9:37 a.m. *i.e.*, four minutes after Fales and Williams. Dec. Brewington, Exh. K. Thus, plaintiff could not have been detained for more than two or three minutes.

Considering these facts in their totality, the Court holds that the detention here amounted to a *Terry* stop and that individual defendants possessed a reasonable suspicion that a domestic situation or assault was in progress or about to occur. Plaintiff's detention was tailored to allow defendant officers to investigate the situation while keeping the police officers, plaintiff and other bystanders from harm. Furthermore, whether these defendants knew plaintiff prior to their arrival at 95 East Fulton is irrelevant because the validity of the stop must be determined based upon objective criteria. *See Brown v. Texas*, 443 U.S. 47, 52 (1979) (holding that initial stop must be based on specific, objective facts establishing a reasonable suspicion of criminal activity). Given all of the foregoing, defendants' motion for summary judgment on plaintiff's false arrest claim is hereby granted.

### b. *Excessive Force*

In *Graham v. Connor*, 490 U.S. 386, 395 (1989), the Supreme Court held

that all "claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard." In an excessive force case, the "reasonableness" inquiry is whether the officer's conduct was "objectively reasonable" given the circumstances at the time, without consideration of the officer's underlying intent or motivation. *Id.* at 397 (citing *Scott v. United States*, 436 U.S. 128, 137-39 (1978)). "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id. (*citing *Scott,* 436 U.S. at 138). The reasonableness analysis must integrate the perspective of an objective officer at the scene and allow for the fact that police officers are "often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

In assessing whether force was excessive, the trier-of-fact should also consider the severity of the crime at issue, whether there was an immediate threat to the officers and other bystanders and whether the suspect was attempting to resist or evade arrest. *Id.* at 396. Furthermore, the fact finder should bear in mind that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).

Defendants argue that where the use of force was minimal or where a plaintiff's injuries are *de minimus*, as they contend plaintiff's were, a claim of excessive force cannot rise to the level of a constitutional violation as a matter of law. The Second Circuit Court of Appeals has held, however, that "[i]f the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987) ("While Robison did not seek medical treatment for her injuries, and this fact may ultimately weigh against her in the minds of the jury in assessing whether the force used was excessive, this failure is not fatal to her claim."). *See also Mickle v. Morin*, 297 F.3d 114, 121 (2d Cir. 2002) (reversing district court's grant of judgment as a matter of law on basis that plaintiff merely had bruises from being handcuffed); *Bellows v. Dainack*, 555 F.2d 1105, 1106 & n.1 (2d Cir. 1977) (rejecting defendants' argument that plaintiff's injuries did not fall within § 1983 and noting sufficiency of excessive force claim where police officers twisted plaintiff's arm, pushed him in the back of police car, pulled him by the scruff of his neck and struck him in the ribs).[10] Accordingly, "[j]ust as reasonable force is not unconstitutional even if it causes serious injury, neither does unreasonable force

_____

10. District courts in this Circuit have also held that the severity of an injury is not dispositive in an excessive force claim. *See, e.g.*, *Yang Feng Zhao v. City of New York*, 656 F.Supp.2d 375, 389 (S.D.N.Y. 2009) (quoting *Robison*, 821 F.2d at 924 and noting that a plaintiff may recover for lesser injuries if the force used was unreasonable); *Espada v. Schneider*, 522 F.Supp.2d 544, 555-56 (S.D.N.Y. 2007) (noting that plaintiff could be entitled to compensatory damages, irrespective of the limited extent of injuries, if the officer acted without justification); *Ortiz v. Pearson*, 88 F.Supp.2d 151, 160 (S.D.N.Y. 2000) ("Although the extent of the injury suffered by a detainee is one factor to be considered when determining whether the use of force was excessive, an injury need not be serious in order to give rise to a constitutional claim.").

become immunized from challenge because it causes only minor injury." *Sash v. United States*, 674 F.Supp.2d 531, 539 (S.D.N.Y. 2009).

As to his injuries, which included a sore throat, difficulty swallowing and a hoarse voice, plaintiff testified that he was in pain after the incident and sought medical treatment. Dec. Brewington, Exh. B, Tr. J. Hodge 136:3-137:25. Plaintiff also testified that his arm and wrist hurt and that the back of his neck was bruised. *Id.* at 140:3-20.

Alonzo Hodge testified that when plaintiff was between five and ten feet away from and walking toward him, defendant Fales commented that he was familiar with plaintiff and "something about a troublemaker." Before plaintiff could respond, according to Alonzo, Fales cames up from behind and shoved plaintiff. Dec. Brewington, Exh. E, Tr. A. Hodge 78:1-79:12. Bertha Hodge testified that while she was talking to Fales at the door on the Riverside Boulevard side, defendant Williams, who appeared to be arguing with plaintiff near the street corner, grabbed him. Dec. Brewington, Exh. F, Tr. B. Hodge 86:5-87:21. She also testified that one of the officers struck plaintiff in the back and spun him around. *Id.* at 88:20-90:5. Plaintiff testified that Williams grabbed him in a bear hug and that while Williams had his waist, Fales had him by the neck and began pulling him backwards, choking him and making it difficult for plaintiff to speak. Dec. Brewington, Exh. B, Tr. J. Hodge 60:10-20. Philip Hodge testified that as James walked away from the first officer (presumably Williams), he grabbed plaintiff by the neck. *Id.* at Exh. D, Tr. P. Hodge 73:23-74:8.

Taking plaintiff's evidence in the light most favorable to him, the Court may not, as a matter of law, grant defendants summary judgment as to plaintiff's excessive force claim. It is well settled that " '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). Accordingly, defendants' motion for summary judgment on this claim is hereby denied.

### c.    *Qualified Immunity*

In *Harlow v. Fitzgerald*, the Supreme Court held that government officials who perform discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818 (1982). Thus, where a law enforcement official demonstrates that he reasonably, although mistakenly, believed his conduct was lawful, qualified immunity provides a complete defense from suit. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

It is beyond dispute that the right of an individual to be free from excessive force has long been clearly established. *See Mickle*, 297 F.3d at 122 (citing *Graham v. Connor*, *supra*, and noting that it is well established that excessive force is constitutionally prohibited); *Calamia v. City of New York*, 879 F.2d 1025, 1036 (2d Cir. 1989). What is at issue, then, is whether it was objectively reasonable for

defendants Fales and Williams to believe the force they used on plaintiff while they briefly detained him was not excessive.

A defendant may not, however, rest on the defense of qualified immunity where facts are in dispute and " 'contrasting accounts . . . present factual issues as to the degree of force actually employed and its reasonableness.' " *Mickle*, 297 F.3d at 122 (quoting *Kerman v. City of New York*, 261 F.3d 229, 239 (2d Cir. 2001)) (" 'Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.' ") (quoting *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999)). *See Ortiz v. Pearson*, 88 F.Supp.2d 151, 154 (S.D.N.Y. 2000) ("When the availability of qualified immunity turns on the disputed underlying material facts, not on the reasonableness of actions taken in undisputed factual circumstances, 'jury consideration is normally required.' ") (quoting *Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994)); *Blissett v. Coughlin*, 66 F.3d 531, 538 (2d Cir. 1995) (holding that summary judgment on qualified immunity grounds should not be granted when underlying facts are in dispute). Accordingly, a grant of summary judgment on qualified immunity grounds is inappropriate and it is up to a properly instructed jury to determine the facts herein.

### d. *Municipal Liability*

Pursuant to *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 692 (1978), 42 U.S.C. § 1983 imposes liability on "a government that, under color of some official policy, "causes" an employee to violate another's

-25-

constitutional rights." To state a claim against a policymaking employer, a plaintiff must allege and prove that the employer had a custom or policy of having its employees engage in violations of another's rights. A municipality's custom or policy may be established by, *inter alia*, demonstrating that its "practice, as opposed to its formal policy, is to engage in . . . constitutional violation[s]." *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 125-26 (2d Cir. 2002)).

Additionally, municipal liability will be found where the discriminatory practices of officials "are persistent and widespread [so that] they 'could be so permanent and well settled as to constitute a "custom or usage" with the force of law.' " *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992) (quoting *Monell*, 436 U.S. at 691). "However, before the actions of subordinate city employees can give rise to § 1983 liability, their discriminatory practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Id.* at 871.

 Plaintiff's amended complaint alleges that "[p]rior to December 13, 2002 and since, the CITY and the POLICE DEPARTMENT has permitted and tolerated a pattern and practice of unjustified, unreasonable and illegal abuses and arrests of Black persons by police officers of the CITY and POLICE DEPARTMENT." ¶ 54. Plaintiff's amended complaint further alleges that because of the City's and police department's policies, police officers were encouraged to believe that they could mistreat Blacks and minorities under circumstances requiring the use of force and

that such behavior would be tolerated and permitted. *Id.* Furthermore, the complaint states that such misconduct was not properly investigated and that testimony by non-police officer witnesses was not credited while reports by officers involved in the incidents were relied upon. *Id.* at ¶ 58. As a direct and proximate result of the City's and police department's customs and policies, defendants mistreated, illegally arrested, falsely imprisoned and wrongfully detained plaintiff in violation of his civil and constitutional rights. *Id.* at ¶ 60.

Plaintiff, however, testified that he was unable to cite one factual example of a pattern or practice of improper treatment of minority persons by the City or its police department. In fact, plaintiff advised defendants' attorney that if *he* (Mr. Ciulla) was to investigate, he would discover a clear pattern of the municipality's custom as it pertains to African-Americans. In addition, plaintiff testified that he could not specifically name any minority persons who were subject to improper treatment by either the City or its police department because he did not have the names with him at the time of his deposition.[11] For that reason, plaintiff was also unable to give any factual examples demonstrating that the City or police department failed to maintain a proper system for investigations of unjustified arrests, beatings and use of excessive force by the police. Dec. Ciulla, Exh. R, Tr. J. Hodge 234:9-237:10.

The evidence, or lack thereof, offered by plaintiff to establish his *Monell* claim falls far short of establishing a discriminatory custom or policy, much less one

---

11. The record indicates that plaintiff was deposed at least two times in connection with his case.

so patent as to give rise to municipal liability. Nor may plaintiff hold the municipality liable on a theory of *respondeat superior* if his excessive force claim is successful. *See Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 415 (1997) ("As we recognized in *Monell* and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights."). Accordingly, defendants' motion for summary judgment on plaintiff's § 1983 claim against the municipality is hereby granted.

### 4. Title 42 U.S.C. § 1986 Claim

Title 42 U.S.C. § 1985(3) provides an action at law for conspiracy to interfere with an individual's civil rights, including equal protection and privileges of the law. Pursuant to 42 U.S.C. § 1986, any person who is aware of wrongs conspired to be done and who has the power to prevent, or aid in preventing, commission of the wrongs, is liable to the party injured. "A claim under § 1986, however, lies only if there is a viable conspiracy claim under section 1985." *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994) (citing *Jews for Jesus, Inc. v. Jewish Community Relations Council of New York*, 968 F.2d 286, 292 (2d Cir. 1992)). Given that plaintiff has voluntarily withdrawn his 42 U.S.C. § 1985(3) conspiracy claim, it follows that he may not maintain a § 1986 claim. Accordingly, for the foregoing reasons, defendants' motion for summary judgment on plaintiff's §1986 claim is hereby granted.

### III.   CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment is hereby **GRANTED** as to plaintiff's 42 U.S.C. § 1983  false arrest and municipal liability claims and 42 U.S.C. § 1986 claim.  Defendants' motion is hereby **DENIED** as to plaintiff's 42 U.S.C. § 1983 excessive force claim and for a finding that defendants are entitled to qualified immunity.

**SO ORDERED**.

Dated:  July 2, 2010
       Central Islip, New York

_____
/s/
Thomas C. Platt, U.S.D.J.
